## OREGON KING MIN. CO. v. BROWN et al.

### (Circuit Court of Appeals, Ninth Circuit. October 6, 1902.)

### No. 816.

**1. MINING CLAIMS—MARKING LOCATION—STATUTORY REQUIREMENT.**

    Rev. St. § 2324 [U. S. Comp. St. 1901, p. 1426], which provides that in marking a mining claim "the location must be distinctly marked on the ground so that its boundaries can be readily traced," does not require the boundary lines to be indicated by physical marks or monuments, nor define what kind of marks shall be made, nor on what part of the ground claimed; but any marking, whether by stakes, mounds, monuments, or written notices, whereby the boundaries can be readily traced, is sufficient.

**2. SAME—RECORD OF LOCATION NOTICE—OREGON STATUTE.**

    Under St. Or. Oct. 14, 1898, providing for the recording of notices of the discovery and location of mining claims, it is not essential to the validity of a location that the record should be a literal copy of the notice posted on the claim, but it is sufficient if it is a substantial copy.

In Error to the Circuit Court of the United States for the District of Oregon.

See 110 Fed. 728.

Cotton, Teal & Minor, for plaintiff in error.

Dolph, Mallory, Simon & Gearin and Albert Abraham, for defendants in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. The Oregon King Mining Company, the plaintiff in error, commenced proceedings in the United States land office at The Dalles, Or., to procure a patent for a certain mining

claim, called the "Silver King." At the time of its application the company was in possession of the claim, and is so still. The defendants in error contested the application, and, in support of their adverse claim, commenced, pursuant to the provisions of section 2326 of the Revised Statutes [U. S. Comp. St. 1901, p. 1430], the present action in the court below to determine the conflicting claims to the ground, in which action judgment passed for the plaintiffs therein, the defendants in error here.

The plaintiff in error claims the ground by virtue of a location thereof made on the 24th day of June, 1898, by one G. M. Wilson. The defendants in error claim it under a location made on the 31st day of January, 1899, by T. J. Brown and Columbus Friend. Substantially the same ground is covered by both locations. That made by Wilson he called the "Silver King Mining Claim," and that made by Brown and Friend was called by them the "St. Elmo Mining Claim." The case shows that Brown, in connection with Friend, first undertook to locate the ground in controversy on the 10th day of March, 1897, but it is conceded that he did not make any valid location thereof prior to January 31, 1899, so that, if the location made by Wilson on June 24, 1898, was valid (to whose rights the plaintiff in error succeeded), the plaintiff in error is entitled to the property; it having entered into the possession thereof under Wilson's location, and having since retained such possession and worked and developed the claim, expending in such work and development a large sum of money.

At the time of the making of the location by Wilson there was no statute of the state of Oregon requiring any record to be made of a mining location, nor did any statute of that state then add to the requirements of the Revised Statutes of the United States in the matter of the making of locations of mining claims. But by an act of the legislature of Oregon approved October 14, 1898, and which took effect January 1, 1899, it was provided that any person who is either, a citizen of the United States, or has declared his intention to become such, who discovers a vein or lode of mineral-bearing rock in place upon unappropriated public land of the United States within the state of Oregon, may locate a claim upon such vein or lode so discovered by posting thereon a notice of such discovery and location, which notice shall contain: First, the name of the lode or claim; second, the name or names of the locator or locators; third, the date of the location; fourth, the number of linear feet claimed along the vein or lode each way from the point of discovery, with the width on each side of said vein or lode; fifth, the general course or strike of the vein or lode, as near as may be. The boundaries of the claim are by the act required to be defined so that they may be readily traced, and they are required to be marked within three days after the posting of such notice by six substantial posts, projecting not less than three feet above the surface of the ground, and not less than four inches square or in diameter, or by substantial mounds of stone, or earth and stone, at least two feet in height. By section 2 of the act such locator is required to file for record with the recorder of conveyances, if there be one,—otherwise with the clerk of the county wherein the claim is situated,—a copy of the notice so posted by him upon the lode or claim,

within 30 days after the date of such posting, which notice is required to be immediately recorded by the officer. By section 3 of the act the locator is required, within 90 days from the date of posting his notice of discovery, to sink a discovery shaft upon the claim located, to a depth of at least 10 feet from the lowest part of the rim of such shaft at the surface, or deeper, if necessary, to show by such work a lode or vein of mineral deposit in place, with a provision to the effect that a cut or crosscut or tunnel which cuts the lode at a depth of 10 feet, or an open cut at least 6 feet deep, 4 feet wide, and 10 feet in length along the lode from the point where the same may be in any manner discovered, shall be deemed equivalent to such discovery shaft, and with a provision to the effect that such work shall not be deemed a part of the assessment work required by the Revised Statutes of the United States.

It appears from the record that the claim in controversy is located upon a large hill, devoid of timber and of vegetation, except a scanty growth of grass, on which a vein of mineral-bearing rock crops out and is clearly visible for a distance of more than 400 feet. It appears that this ledge was known to persons living in the vicinity thereof prior to the coming into the country of either Brown or Wilson, but apparently was not much thought of. About the 1st of March, 1897, Brown went to the vicinity for the purpose of making a visit to Friend. During the time of that visit the two made a trip to a sheep ranch, on their way to which Brown found float from the ledge, and stopped and began to prospect it. Friend said that it did not amount to anything, but Brown continued to examine the ledge while Friend proceeded to the sheep camp; and during his absence Brown erected a monument on the ground, and wrote out a notice of location in behalf of himself and Friend, which he placed in the monument, and took some of the samples of the rock to Friend's house. Shortly after this, and without doing any work upon the claim, Brown left the country, and remained away until about the 1st of September, 1897, when he returned with a man named Allen, whom he sought to interest in the claim; but after putting in some shots in the ledge and making some tests of the rock (which they made at the house of a Mr. Furnall, where they were staying), Allen concluded that it was not rich enough, and declined to take any interest in the claim. Brown and Allen then left. In September, 1897, Wilson, who had been out prospecting, stopped at Furnall's house; and on that occasion Furnall picked up a piece of rock from this ledge and said, "Here is a piece of rock I can either pan or mortar up and wash gold out of it." Wilson asked where the rock came from, and Furnall pointed to the hill where the ground in controversy is located. When Wilson left for his home he took with him a piece of the rock which Furnall gave him, and during the succeeding winter had it assayed, with the result that it showed a high value in gold. About the 1st of June, 1898, Wilson returned to the neighborhood with John Knight and J. F. Hubbard; first going to the house of Furnall, and afterwards to that of Friend. From there, Wilson, Knight, and Hubbard went up the hill in search of the ledge from which the rock given him by Furnall was taken. They found it, and also the monument and notice erected and posted by

Brown in behalf of himself and Friend in the preceding year. Wilson and Hubbard and Knight thereafter from time to time did work upon the ledge, consisting of small cuts, and took ore therefrom, which upon assay showed considerable value in gold and silver, and on the 24th day of June, 1898, put up at the east end of the Silver King claim a mound of rock taken from one of the cuts made by them, in which they placed a notice reading as follows:

"State of Oregon, County of Crook—ss: Know all men by these presents that I, the undersigned, has this 24th day of June, 1898, claimed, by right of discovery and location, 1,500 feet of linear and horizontal measurement in length, and 600 feet in width, a quartz ledge along the vein or lode thereof, 1,500 feet of said claim lying and being in westerly direction from the mound of stone of the discovery monument, with all dips, spurs, variations, and angles; said claim being more particularly described as follows: Situated on Sec. 30, T. 9, R. 17 E., Crook county, Oregon, near the Trout creeks. This claim shall be known as the 'Silver King.' Also I claim all water right to work the same.

"Discoverer:
"G. M. Wilson.

"Witnesses:
   "J. F. Hubbard.
   "John Knight."

There was evidence given on behalf of the defendant (plaintiff in error) tending to show that Wilson, Hubbard, and Knight then stepped to the west, intending to measure 1,500 feet, and in the west end set in the ground a juniper stake, about 4 inches square, so that it stood up out of the ground about 4 or 4½ feet,—the stake being set about on a line with the ledge; that on the east side of the stake they marked, "Silver King 1,500 feet easterly," and on its south side, "300 feet southerly," and on its north side, "300 feet northerly." Shortly after this the party left the country, and returned about the 1st of August of the same year, and sunk a shaft on the vein about 6 by 4 feet, and to a depth of 9 or 9½ feet. Wilson and Hubbard then left, leaving Knight at the claim for the purpose of shipping some ore therefrom to the smelter at Tacoma, which he did, to the extent of 5 tons, during the month of September, and from which was realized about $125 per ton. A few days after getting this return, Knight went back to his home, at Pendleton, Or. In the early part of February, 1899, he returned to the claim, and found Brown in possession; Brown having been informed during January, 1899, by Mrs. Furnall, of the result of the ore shipment by Knight. Brown, contending that Wilson had no right to make a location of the ground in controversy, proceeded on the 31st day of January, 1899, to locate the same ground in behalf of himself and Friend; undertaking to mark and stake the boundaries thereof, and placing in the monument at the east end, alongside of Wilson's monument, a notice in these words and figures:

"Location Notice.

"State of Oregon, County of Crook: Know all men by these presents that we, the undersigned, have this 31st day of January, 1899, do locate this ledge of mineral-bearing quartz, commencing at this monument of stone, running 1,500 linear feet in a westerly direction to a stake. We also claim 300 linear feet on each side of center line along this ledge, with claim all dips, spurs, angles, and variations, being particularly described as follows: Sec. 30, T.

9, R. 17 E., Crook county, Oregon, ¾ mile east of Trout creek. This claim shall be known as the 'St. Elmo Mining Claim.'

"Witnesses:                              Locators:
   "Nettie Friend.                         T. J. Brown.
   "Anna Brown.                            C. Friend."

The ground so located by Brown on the 31st day of January, 1899, was substantially the same ground undertaken to be located by Wilson on the 24th day of the previous June; and, according to the testimony of Brown himself, substantially the same ground was undertaken to be embraced by his lines, for the reason that he claimed to have been the first discoverer of the vein, and for the reason that he contended that Wilson's location was invalid.

Trout Creek mining district, in which is situated the ground in controversy, was organized in August, 1898; and on the 15th day of that month one James Wood was appointed deputy recorder for such district, under and in pursuance of the provisions of section 3831 of Hill's Annotated Laws of Oregon, which reads as follows:

"It shall be the duty of the county clerk of any county, upon the receipt of notice of a miners' meeting organizing a miners' district in said county, with a description of the boundaries thereof, to record the same in a book to be kept in his office as other county records, to be called a 'book of record of mining claims'; and upon the petition of parties interested, he may appoint a deputy for such district, who shall reside in said district or its vicinity, and shall record all mining claims and water rights in the order in which they are presented for record, and shall transmit a copy of such record at the end of each month to the county clerk, who shall record the same in the above-mentioned book of record, for which he shall receive one dollar for each and every claim. It shall further be the duty of said county clerk to furnish a copy of this law to his said deputy, who shall keep the same in his office, open at all reasonable times for the inspection of all persons interested therein."

This section of the Code was repealed by the Oregon act of October 14, 1898. Nevertheless Wood continued to act as such deputy recorder of mining claims until June 21, 1899. After the location by Brown and Friend of the ground in controversy as the St. Elmo claim on the 31st day of January, 1899, and the posting thereon of the notice by them last above set out, they gave to Wood a copy thereof for record. Wood had blank forms of his own, into which his practice was to incorporate the substance of mining notices filed with him for record, which he recorded in his record book, and thereafter forwarded the blank so filled in to the county clerk for record. He pursued that course with the notice filed with him by Brown and Friend; the notice so recorded in the book of records of the mining district, and forwarded by Wood to the county recorder, reading as follows:

"Notice is hereby given that the undersigned, being a citizen of the United States of America, and over the age of twenty-one years, and having complied with the requirements of chapter six of title thirty-two of the Revised Statutes of the United States, and the local customs, laws, and regulations, has located 1,500 feet linear and horizontal measurement in length, and 600 feet in width, on the lode or vein of mineral-bearing quartz, with all dips and spurs and angles; said lode being situated in the Trout Creek mining district, of Crook county, Oregon, and more particularly described as follows: Beginning at a monument of stone, and running 1,500 feet in a westerly course to a stake, with 300 feet of ground on each said [side] of said de-

scribed line, situated ¾ of a mile east of Big Trout creek, in Sec. 30, T. 9, R. 17 East. This claim shall be known as 'The St. Elmo.' Located this 31st day of January, 1899.                    T. J. Brown and O. Friend, Locators.
    "Witnesses:
            "Nettie Friend.
            "Anna Brown."

Brown remained in possession of the claim from the time of the location made January 31, 1899, until the 1st of April following, during which time he did some work upon it. Friend conveyed his interest therein to Brown on the 21st day of February of the same year, and thereafter Brown conveyed a half of his interest in the claim to the defendant in error Maddox. On the trial there was testimony tending to show that at the time of Brown's location, on the 31st day of January, 1899, the west end center stake claimed to have been placed by Wilson did not in fact exist. About the 1st of April, Brown left the claim, which was soon taken possession of by Wilson under his location of June 24, 1898, and has ever since been held by him and those claiming under him.

The fundamental questions contested at the trial in the court below, and presented by the record here, are: First, whether the Wilson location, made June 24, 1898, was properly marked upon the ground; and, second, if it was not, whether a copy of Brown's location of January 31, 1899, was recorded as required by the act of the state of Oregon of October 14, 1898. Other questions, of a minor character, also arose during the trial in the court below, which it will be unnecessary to consider, in the view we take of the case.

The case was tried with a jury. In the answer of the defendant to the plaintiff's complaint, it was, among other things, alleged: That Wilson, having on the 24th day of June, 1898, discovered therein a vein of rock in place, carrying precious metals, located a claim called the "Silver King Mining Claim," embracing the vein; so marking it that its boundaries could be readily traced; the same being "by the erection of a monument of stone at least two feet in diameter at its base, and four feet in height, which said monument was so erected and located at the east end center of said Silver King mining claim, and at the east end of said ledge, lead, lode, or vein of rock in place, and by making a cut into said ledge, lead, lode, or vein, and along the same, which said cut was 5 feet wide, 8 feet long, and 6 feet deep at the upper end thereof; and said Wilson then and there placed in a conspicuous place in said monument, at the east end center of said claim, a notice in words and figures" as hereinbefore set out. "That, at the point where said monument was so erected, said ledge, lead, lode, or vein of rock in place crops out, and forms a ridge upon the surface of the ground, and is plainly visible, and can be readily traced and followed in a straight line from said point for a distance of over 400 feet therefrom, in a westerly direction; said ground being barren and devoid of timber or vegetation, excepting only a scanty growth of grass. That the said G. M. Wilson at said time further distinctly marked said claim and the location thereof upon the ground, by placing a square stake at the west end center of said claim, and in a line with said ledge, lead, lode, or vein of rock in place, and an extension thereof, which said

square stake was firmly set in the ground, and projected at least 3 feet above the ground, and was at least 4 inches in diameter, and was so set in the ground that one of the sides thereof faced towards the said monument of stone at the east end center of said claim, and said face of said stake was plainly marked 'Silver King,' '1,500 feet easterly,' and the north face of said stake was plainly marked '300 feet northerly,' and the south face of said stake was plainly marked '300 feet southerly.' That said G. M. Wilson set said stake in a line with the croppings of said ledge, lead, lode, or vein of rock in place, and upon the extension thereof, and intended to set the same 1,500 feet westerly along said ledge, lead, lode, or vein, and an extensoin thereof from said monument of stone at the east end center of said claim, but miscalculated the distance thereof, and set said stake 1,368 feet westerly from said east end center monument. That said G. M. Wilson further at said time distinctly marked said claim and the location thereof upon the ground, by sinking a shaft upon the line of said croppings of said ledge, lead, lode, or vein of rock in place, and on a direct line between said discovery monument and said west end center stake, which said shaft was sunk to a depth of nine feet, and at a point about 400 feet westerly from the east end center, and also by running a crosscut about 50 feet long, connecting with said shaft."

At the trial the defendant (plaintiff in error here) requested the court to instruct the jury that, if Wilson marked his claim as alleged in the answer, such marking was a sufficient compliance with section 2324 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 1426], and that Wilson's location, so far as marking was concerned, was therefore valid, which instruction the court below refused to give, to which action the defendant excepted. The court below, in more than one instance, against the objection and exception of the defendant, refused to determine the validity or invalidity of the Wilson location as a matter of law, but submitted that question to the jury as one of fact, under instructions as to the law by which they should be guided in determining the question. Concerning the necessary marking of the claim, the court said in its instructions:

"The test is not as to whether the notice would so describe the claim that it could be surveyed. The lines themselves must be indicated by physical marks or monuments, so that one unfamiliar with surveying, and without the aid of measuring instruments or a compass, can readily see by the marks themselves just what is claimed; that is to say, it is my opinion that it is not sufficient that a surveyor might go and find this claim, for the reason that the object of this notice and marking is to advise people who are in that country, and who are not surveyors, and in cases where it is not practicable to have that kind of service, to determine by observation, from what has been done upon the ground, that there has been a location, and its boundaries. The plain provision of the statute which requires a mining location to be so marked upon the ground that its boundaries can be easily traced is salutary and beneficial, and is not to be frittered away by construction. After the discovery, the marking is the main act of location. Without it the location is invalid."

The most of what was there said by the court below was correct and proper. The vice is in that part of the instruction in which the jury was clearly and distinctly told that the lines themselves must be indicated by physical marks and monuments, so that one unfamiliar with

surveying, and without the aid of measuring instruments, can readily see just what is claimed. The opinion entertained and given effect by the court below in its rulings in respect to the necessity of indicating the boundaries of the claim by physical marks or monuments, in order to constitute a valid location, is further shown by its refusal to give the following instructions requested by the defendant, to which exceptions were reserved:

"In regard to the manner of marking, I call your attention to the fact that the law does not require the boundaries of the claim to be marked. It is the location that must be marked, and the law does not say how it shall be marked, excepting that it must be distinctly marked, so that its boundaries can be readily traced; that is, the location must be designated by some means placed upon the ground, so that any one visiting the ground, and endeavoring to do so, can readily trace the boundaries of the location made."

"At the time Wilson attempted to make his location, the law did not prescribe or define what kind of markings he should make, or upon what part of the ground or claim he should place the same. He was not required to place such markings at the corners of the location. Any marking on the ground claimed, by means of stakes, mounds, and written notices, is sufficient, if thereby the boundaries of the location can be readily traced; and in this connection you have a right to take into consideration the character of the ground, and any natural conditions that may aid the markings placed upon the location in determining its boundaries, or which may assist in the tracing of the boundaries from any markings which may have been placed upon the same."

The statute under and by virtue of which such locations are made does not say that the boundaries shall be indicated by physical marks or monuments, nor in any particular or designated manner. The requirement is that the location shall be so distinctly marked on the ground as that its boundaries may be readily traced. Section 2324, Rev. St. U. S. [U. S. Comp. St. 1901, p. 1426]. It has been many times decided that any marking on the ground, whether by stakes, monuments, mounds, or written notices, whereby the boundaries of the location can be readily traced, is sufficient. The latest decision by the supreme court of the United States to that effect is found in the case of McKinley Creek Min. Co. v. Alaska United Min. Co., 183 U. S. 563, 22 Sup. Ct. 84, 46 L. Ed. 331, in which the notice described each of two locations as "a placer mining claim 1,500 feet, running with the creek, and 300 feet on each side from center of creek known as 'McKinley Creek,' in Porcupine mining district." "These notices," which it appears were written upon a stump or snag in the creek, said Mr. Justice McKenna, delivering the unanimous opinion of the supreme court, "constituted a sufficient location. The creek was identified, and between it and the stump there was a definite relation, which, combined with the measurements, enabled the boundaries of the claim to be readily traced."

In Gleeson v. Mining Co., 13 Nev. 442, 462, the court, speaking through Beatty, J., said:

"The object of the law in requiring the location to be marked on the ground is to fix the claim, to prevent floating or swinging, so that those who in good faith are looking for unoccupied ground in the vicinity of previous locations may be enabled to ascertain exactly what has been appropriated, in order to make their locations upon the residue. We concede

that the provisions of the law designed for the attainment of this object are most important and beneficent, and that they ought not to be frittered away by construction. But it must be remembered that the law does not, in express terms, require the boundaries to be marked. It requires the location to be so marked that its boundaries can be readily traced. Stakes at the corners do not mark the boundaries. They are only a means by which the boundaries may be traced. Why not, then, allow the same efficacy to the marking of a center line in a district, where the extent of a claim on each side of the center line is established by the local rules? It would be safer, and therefore better, to comply with the recommendations of the land office, and erect stakes at the corners of the claim; but, if the grand object of the claim is attained by the marking of a center line, we can see no reason why it should not be allowed to be sufficient. In this case the locators of the Paymaster marked the center line of their claim on the 10th of October, 1872. No miner, no man of common intelligence acquainted with the customs of the country, could have gone on the ground and seen the monument, notice, and work at the discovery point, and the two stakes, one three hundred feet southeast of the location monument, marked, 'Southeasterly stake of Paymaster,' the other twelve hundred feet northwest of the location monument, and marked, 'Northwesterly stake of Paymaster,' in a line with the croppings and with the discovery point, without seeing at a glance that they marked the center line of the claim. By the rules of the district and the laws of the land, he would have been informed that the boundaries of the claim were formed by lines parallel to the center line, and three hundred feet distant therefrom, and by end lines at right angles thereto. With this knowledge, he could easily have traced the boundaries, and, if such was his wish, ascertained exactly where he could locate with safety."

Judge Sawyer, in instructing the jury in the case of North Noonday Min. Co. v. Orient Min. Co. (C. C.) 11 Fed. 125, 6 Sawy. 299, 310, upon the point in question, said:

"To make a valid location under the statute, it is required that 'the location must be distinctly marked on the ground, so that its boundaries can be readily traced'; but the law does not define or prescribe what kind of marks shall be made, or upon what part of the ground claimed they shall be placed. Any marking on the ground claimed, by stakes and mounds and written notices, whereby the boundaries of the claim located can be readily traced, is sufficient. If the center line of a location of a lode claim lengthwise along the lode be marked by a prominent stake or monument at each end thereof, upon one or both of which is placed a written notice showing that the locator claims the length of said line upon the lode from stake to stake, and a certain specified number of feet in width upon each side of such line, such location of the claim is so marked that the boundaries may be readily traced, and, so far as the marking of the location is concerned, is a sufficient compliance with the law."

In speaking to the same point, Judge Hawley, in the case of Book v. Mining Co. (C. C.) 58 Fed. 106, 113, said:

"All the authorities agree that any marking on the ground by stakes, monuments, mounds, and written notices, whereby the boundaries of the location can be readily traced, is sufficient."

See, also, Haws v. Mining Co., 160 U. S. 303, 318, 16 Sup. Ct. 282, 40 L. Ed. 436; Southern Cross Gold & Silver Min. Co. v. Europa Min. Co., 15 Nev. 383; Jupiter Min. Co. v. Bodie Consol. Min. Co. (C. C.) 11 Fed. 667; Hauswirth v. Butcher, 4 Mont. 308, 1 Pac. 714; Upton v. Larkin, 7 Mont. 449, 17 Pac. 728; Pollard v. Shively, 5 Colo. 309; Eilers v. Boatman, 3 Utah, 159, 2 Pac. 66; Du Prat v. James, 65 Cal. 555, 4 Pac. 562; Taylor v. Middleton, 67 Cal. 656, 8 Pac. 594.

The error committed by the court below, above indicated, necessi-

tating the reversal of the judgment and the remanding of the case for a new trial, it becomes necessary to decide but one other of the questions presented by the appeal; and that is whether or not it be necessary that the copy of the notice of location required by the Oregon statute to be recorded be a literal and exact copy of the notice posted. We think it clear that it need only be a substantial copy. Gird v. Oil Co. (C. C.) 60 Fed. 531; Myers v. Spooner, 55 Cal. 257; Doe v. Mining Co., 17 C. C. A. 190, 70 Fed. 457; Metcalf v. Prescott (Mont.) 25 Pac. 1038; Preston v. Hunter, 15 C. C. A. 148, 67 Fed. 996; Carter v. Bacigalupi (Cal.) 23 Pac. 363; Deeney v. Milling Co. (N. M.) 67 Pac. 724; Lindl. Mines, § 381; Barringer & A. Mines & M. p. 253.

The judgment is reversed, and cause remanded for a new trial.